■ In the Matter of Nassau County Department of Social Services, on Behalf of Erika K., Respondent, v Steven K., Appellant. (Proceeding No. 1.) In the Matter of Nassau County Department of Social Services, on Behalf of Meredith K., Respondent, v Steven K., Appellant. (Proceeding No. 2.)—In consolidated child protective proceedings pursuant to Family Court Act article 10, the father appeals from a dispositional order of the Family Court, Nassau County (Capilli, J.), dated August 25, 1989, which, upon a fact finding order of the same court, dated April 5, 1989, made after a hearing finding that he had abused and neglected his two infant children, Meredith K. and Erika K., ordered, *inter alia,* that there shall be no visitation by him with the infant children until he "becomes involved in a program that specializes in incest offenders and completes said program". The appeal from the dispositional order brings up for review the fact-finding order dated April 5, 1989.

Ordered that the dispositional order is reversed, on the facts, without costs or disbursements, and the provision of the fact-finding order which sustained that branch of the amended petition which alleged that the father engaged in penile intercourse with his child Meredith is vacated, and it is further,

Ordered that the matter is remitted to the Family Court, Nassau County, for a new dispositional determination.

In January 1988 the Nassau County Department of Social Services filed amended child abuse and neglect petitions against the father on behalf of his children Meredith K., who

was four years of age at the time, and Erika K., who was two and one-half years old at the time.

The petitions alleged, *inter alia,* that on "numerous and diverse occasions occurring prior to about October 27, 1987" the father had (1) put his penis in Meredith's vagina, (2) inserted his fingers in Meredith's vagina, and (3) touched the vagina of Meredith's sibling, Erika. The petitions alleged that all of these acts threatened and endangered Meredith's and Erika's emotional health, safety and well being.

The allegations of abuse, heretofore described, were based on out-of-court statements made by the two children. It is well settled that out-of-court statements of a child relating to allegations of abuse are admissible at a fact-finding hearing and, if they are properly corroborated by evidence tending to support their reliability, may support a finding of abuse *(see,* Family Ct Act § 1046 [a] [vi]; *Matter of Nicole V.,* 71 NY2d 112; *Matter of Christina F.,* 74 NY2d 532; *Matter of Ely P.,* 167 AD2d 473; *Matter of Laura W.,* 160 AD2d 585). Corroboration may take the form of "validation testimony" of experts regarding their investigations of the underlying complaints *(Matter of Linda K.,* 132 AD2d 149, 157; *Matter of Nicole V., supra,* at 121) as well as in camera statements by the child *(see, Matter of Tina H.,* 123 AD2d 864; *Matter of Dana F.,* 113 AD2d 939, 940). In the instant proceeding, the Family Court held, *inter alia,* that the validation testimony of a social worker, Yael Layish, constituted sufficient corroboration of the aforenoted allegations of abuse. We agree with this ruling and disagree with our dissenting colleague's view that Ms. Layish was incompetent to serve as a validator. On the contrary, the credentials and competence of Ms. Layish are amply established in this record.

Ms. Layish testified on direct examination that she worked at the Family Crisis Clinic Program "doing evaluations of physical abuse, neglect and child sexual abuse allegations and treatments of children and their families". In response to a question about her licenses, she responded that she received "[her] Masters in 1978 [her] C.S.W. a year after that, and the A.C.S.W. about two years after the C.S.W., and the Diplomate, a year ago". Moreover, contrary to the suggestion in the dissent, the 40 to 45 validations in child abuse cases that Ms. Layish conducted with Kate Fitzgerald were not done under Ms. Fitzgerald's supervision, but were done jointly with Ms. Fitzgerald. As Ms. Layish clearly stated: "We are doing it jointly, Kate Fitzgerald does not supervise". More importantly, Ms. Layish testified that she used "the Suzanne Sgroi

Protocol as a standard or guideline" in her evaluations of the children. Indeed, one of the father's witnesses, Dr. Allen Levy, an expert in the field of child psychiatry, testified that as part of his training, he attended a two-day training seminar given by Suzanne Sgroi, and also admitted that (1) the Suzanne Sgroi handbook is "considered the bible so to speak" and (2) Ms. Layish's use of anatomical dolls was an accepted and good tool in determining cases of child abuse.

The dissent also relies on the fact that the parents were involved in a bitter divorce, and that allegations by one parent against another concerning sex abuse of a child must be treated with great caution in that particular context. Suffice it to say, Ms. Layish was fully cross-examined on this issue, as well as on her failure to examine the children in the presence of the parents, and nevertheless held steadfastly to the view that the children's allegations were worthy of belief. The dissenter's specific reliance on the fact that the mother carved an obscenity into the family car with a key was explained by the mother as a response to the father's violent physical attack on her when she tried to leave the house and use the car. In any event, that incident is irrelevant on the issue of Ms. Layish's qualifications, competency and credibility. In a final attempt to discredit Ms. Layish, the dissent alleges that Layish's testimony was somehow fatally skewed since she was a member of the same "Family Crisis" Team which had originally referred this matter to the Nassau County authorities. This allegation is totally without foundation in the record. In short, the out-of-court statements of the children concerning the allegations of abuse were sufficiently corroborated by the testimony of the validator Ms. Layish.

In its findings of fact, the Family Court summarized all of the relevant testimony including, *inter alia,* the corroborating validation testimony of Ms. Layish and the medical testimony of Dr. Bruce Bogard, head of the Child Protection Team at Long Island Jewish/Hillside Medical Center. The Family Court noted that Ms. Layish had testified that "Meredith had vaginal intercourse with her father" and Erika was the victim of "inappropriate sexual conduct" by her father including touching "her vagina with his penis". The Family Court then made a finding, based, *inter alia,* on the testimony of Ms. Layish and Dr. Bogard, who had testified that it was possible for a child of the age of two to four years old to have undergone digital penetration without leaving a mark on the hymen, that the "petitioner has established the allegations in its petition by a fair preponderance of the evidence with

respect to both children and the Court makes an affirmative finding of abuse and neglect against the respondent". Under the circumstances, it is clear that the Family Court complied with Family Court Act § 1051 (a) which provides that the Family Court "shall * * * enter an order finding that the child is an abused child or a neglected child" and "shall state the grounds for the finding" of abuse and neglect. There is no requirement in Family Court Act § 1051 (a) that the Family Court, in its decision, must refer to each specific allegation of abuse and neglect in the petition. Consequently, there is no merit to the dissent's argument that the Family Court's order is defective as a matter of law in this regard. In any event, this omission, as well as the Family Court's failure to make a "further finding of the specific sex offense as defined in article one hundred thirty of the penal law" (Family Ct Act § 1051 [e]), is of no serious moment. On the instant record, this court can, in order to save judicial time and avoid multiplicity of litigation, make the finding that the Family Court should have made *(see, Fischer v Fischer, 45 AD2d 917)*. Accordingly, we find, based on the aforenoted testimony of Ms. Layish and Dr. Bogard, that the petitioner proved by a preponderance of the evidence that the father inserted his fingers in Meredith's vagina and touched Erika's vagina, as alleged in the petitions, in violation of Penal Law § 130.65.

However, we find that the allegation of the father's penile intercourse with Meredith, even though corroborated by Ms. Layish, was not proven by a preponderance of the evidence. Specifically, the validator testified that, based on her interviews and sessions, Meredith was subject to penile intercourse with her father on at least several occasions. However, the petitioner's medical witness, Dr. Bogard, testified that Meredith had "a normal prepubertal vagina". Dr. Bogard observed a red spot and a tiny healed scar on Meredith's hymen and noted that the hymen was "open about five millimeters as measured". Dr. Bogard admitted on cross-examination that a five millimeter opening was within normal parameters for a child of Meredith's age and that the red spot and the tiny scar could have been the result of several other causes, including a straddle injury such as climbing a fence or riding a bicycle. The medical witness of the respondent father, Dr. Jeffrey Gilbert, confirmed that a five millimeter opening in the hymen was a normal finding for a child of Meredith's age, and noted that the two spots thereon were insignificant with respect to the issue of penile intercourse. Dr. Gilbert further stated that if repeated instances of penile intercourse had

taken place as alleged in the petitions, the hymen "would show either a complete rupture or areas of tears or rips or scars over a period of time".

The dispositional order suspended the father's visitation until he "becomes involved in a program that specializes in incest offenders and completes said program". In so holding, the Family Court took the somewhat unusual step of rejecting the recommendation of the Nassau County Probation Department that supervised visitation with the father be continued. Since the Family Court's disposition may have been based, in part, on a finding that the father engaged in penile intercourse with his child Meredith, and that finding has been specifically rejected by this court, we deem it appropriate to remit this matter to the Family Court for a new dispositional determination.

We have examined the father's remaining arguments and find them to be without merit. Mangano, P. J., Harwood and Balletta, JJ., concur.

Kooper, J., dissents and votes to reverse the order appealed from, vacate the fact-finding order in its entirety, and dismiss the petitions, with the following memorandum. I am unable to concur in the majority's determination that the remaining allegations of abuse were proven by a preponderance of the credible evidence. In my view, neither the testimony of the validator nor the in camera interviews constituted sufficient corroboration of the children's alleged out-of-court statements, upon which the allegations of the petitions are based. Accordingly, the order appealed from should be reversed and the petitions dismissed.

In sustaining portions of the petitions, the majority necessarily relies, in part, upon the testimony of Yael Layish, the social worker who interviewed the children and concluded that they had been sexually abused and, more particularly, that the appellant had engaged in sexual intercourse with Meredith on "several occasions", a finding which is completely at odds with the medical evidence adduced at the fact-finding hearing. Although the majority has rejected Ms. Layish's testimony with respect to her conclusion that the appellant engaged in sexual intercourse with Meredith, it nevertheless chooses to credit Ms. Layish's remaining findings, all of which were premised upon the very same methods and evaluative techniques. I am aware of no authority which supports the novel proposition that an expert's testimony can be selectively sustained or rejected where the findings in issue were derived from the same suspect clinical evaluation process.

Nor do I understand how a witness whose professional methodology and conclusions have been discredited with respect to the most serious and obviously defective allegation is nevertheless credible with respect to the far more subtle and difficult to evaluate allegations the majority now sustains. Logic dictates that precisely the opposite conclusion must be drawn with respect to Ms. Layish's evaluative skills and the reliability of her findings, i.e., that Ms. Layish's testimony, found to be irreconcilably contrary to the available medical evidence, cannot possibly provide a viable foundation for the remaining allegations of abuse which the majority now upholds. Nor is there credible evidence in the record establishing that the findings which the majority accepts are any more reliable than those which it has properly chosen to reject. To the contrary, the record reveals that Ms. Layish's findings with respect to the remaining allegations of abuse are as lacking in reliability as her conclusion concerning the allegation of sexual intercourse.

Specifically, the record reveals that Ms. Layish, who also acted as Meredith's private therapist, testified that she first began evaluating cases of child sex abuse some six months prior to conducting her first interview with Meredith. Although she had performed 40 to 45 validations while training together with a more experienced supervisor, she had conducted only "five or six" validations without assistance prior to this case. According to Ms. Layish, her formal training in child abuse evaluation consisted of her attendance at an eight-week in-service training program at North Shore University Hospital in 1987 and her participation in a one-day follow-up session. Ms. Layish further testified that while she had earned a master's degree from Adelphi University in 1978, she did not possess any certificates or licenses as a consequence of her training in child abuse evaluation. Moreover, while Dr. Allen Levy, one of the appellant's expert witnesses, also attended a two-day seminar given by Dr. Suzanne Sgroi, and spoke highly of Dr. Sgroi's methodology, the thrust of Dr. Levy's testimony was not necessarily that Ms. Layish's reliance upon Dr. Sgroi's protocols was improper, but that Ms. Layish erred in applying Sgroi's methodology during her interviews.

In support of her conclusion that abuse had taken place, Ms. Layish relied heavily upon the children's demonstrations with the anatomically correct dolls, upon certain statements made by the children and various themes in their play which Ms. Layish construed as suggestive of sexual abuse. She acknowledged, however, that Meredith had been diagnosed as suffer-

ing from "severe separation anxiety" stemming from her parents' separation and divorce. Ms. Layish observed in her first few sessions with Meredith that she was "extremely oppositional", restricted in her ability to play out a variety of themes, and displayed "a tremendous amount of * * * anxiety".

Despite her knowledge that the mother's allegations were made during a highly acrimonious divorce proceeding, Ms. Layish conceded that she did not interview the appellant prior to reaching her conclusion. Indeed, Ms. Layish testified on cross-examination that her evaluation was "based strictly on what the child [Meredith] told me and [what she] demonstrated to me in the interviews". Significantly, in its recently published Guidelines for Clinical Evaluation of Child and Adolescent Sexual Abuse, the American Academy of Child and Adolescent Psychiatry emphasized that "[i]t is important to obtain a history from the perspective of each parent", and further cautioned that "[t]he possibility of false allegations needs to be considered, particularly if the allegations are coming from the parent rather than the child, if parents are engaged in a dispute over custody or visitation and/or if the child is a preschooler". The Academy's guidelines also warn against using anatomically correct dolls "in a way to instruct, coach or lead the child" and additionally note that the dolls "should not be used as a short cut to a more comprehensive evaluation of the child and the child's family". I further note that the American Psychological Association, in its recent Statement on the Use of Anatomically Detailed Dolls in Forensic Evaluations has observed that, "[t]here are currently no uniform standards for conducting interviews with the dolls". The record here establishes not only that Ms. Layish relied heavily upon anatomically correct dolls in reaching her conclusions, but also indicates that the children had been previously exposed to these dolls on at least two occasions and questioned by other employees of North Shore University Hospital prior to being interviewed by Ms. Layish.

Specifically, the record reveals that the children's mother first brought the allegations of abuse to the attention of a Dr. Victor Fornari, a psychiatrist associated with North Shore University Hospital. Dr. Fornari, who had been treating Meredith for unrelated emotional difficulties, testified that although he was not trained as a validator, he displayed "anatomically correct" dolls to Meredith and questioned her with respect to the allegations of abuse made by her mother. Notably, Dr. Fornari testified that in treating Meredith prior

to being apprised of the alleged abuse, he had noticed no sexual themes in Meredith's play. After conducting his interview with Meredith, Dr. Fornari referred the matter to Carol Samit, the Assistant Coordinator of the "Family Crisis Program" at North Shore University Hospital. Ms. Samit interviewed Erika in her mother's presence, and permitted the mother to pose questions to the child during some of the sessions. Ms. Samit, who also utilized "anatomically correct" dolls in her interviews, conceded that she could not "validate Erika's statements strongly".

Moreover, although the majority cites the absence of medical evidence as dispositive in rejecting Ms. Layish's finding concerning sexual intercourse, the medical evidence provides no greater support for Ms. Layish's remaining findings, which the majority has sustained. As the majority notes, Dr. Bruce Bogard conducted the physical examinations of the children and testified that he had reached no specific conclusions with respect to the commission of abuse. He subsequently amplified this assessment when he stated that his findings constituted "neither proof nor disproof" of child abuse. The results of Dr. Bogard's examination were entirely consistent with his inability to make any particular diagnosis of sexual abuse. Indeed, the only arguable anomalies he discovered were "two little bruises" on Meredith's hymen and a five millimeter opening therein. Dr. Bogard subsequently agreed on cross-examination that several studies have shown that a five millimeter opening is within normal parameters for a child of Meredith's age. He also testified that the insertion of an adult male finger into a child's vagina would likely create a hole "significantly [larger] than five millimeters".

Although Dr. Bogard speculated that it would be "possible" for penetration to occur without injury to the hymen, his assertion in this regard does not constitute corroborative evidence in light of his overall conclusion that the medical findings constituted "neither proof not disproof" of abuse. I note in this respect that the appellant's medical expert, Dr. Jeffrey Gilbert, Senior Medical Specialist at the New York City Sexually Transmitted Disease Bureau, confirmed that a five millimeter opening in the hymen was a normal finding for a child of Meredith's age. In my view, the foregoing medical evidence—much of it from the petitioner's own expert—refutes Ms. Layish's conclusions that the children were subjected to any type of sexually abusive conduct.

It is also significant that Ms. Layish was a member of the same "Family Crisis" team which had preliminarily examined

the children and concluded that sufficient evidence existed to warrant a referral to the Nassau County authorities. Accordingly, members of the Family Crisis team not only examined the children and their mother, but also subsequently produced the witness whose evaluation constituted one of the key pieces of evidence in support of the petitioner's case. Additionally, it appears that during the team's initial inquiry, none of the team members formally discussed the substance of the mother's allegations with the appellant until after the decision had been made to refer the matter to the Nassau County Department of Social Services. The team's preliminary decision to refer the matter may well have subsequently inclined Ms. Layish towards reaffirming the validity of that determination by validating the allegations of abuse contained in the petitions. Further, I question Ms. Layish's ability to function as an entirely objective and impartial evaluator under the circumstances presented. The record indicates that she was acting as Meredith's private therapist both at the time her validation interviews were conducted and subsequently, when she appeared at the fact-finding hearing and offered testimony on the petitioner's behalf. As a consequence, and at the time she offered her opinion at the fact-finding hearing, Ms. Layish was employed by the very same interested party who originally accused the appellant of abusing the children, an unseemly circumstance which casts doubt upon her professional objectivity and significantly detracts from the reliability of her conclusions. Although the majority concludes otherwise, Ms. Layish's Family Crisis team membership and the possibility that it may have affected her professional judgment, are relevant to any assessment of her findings and conclusions.

The foregoing questions surrounding Ms. Layish's professional detachment and objectivity convincingly establish that the Family Court improvidently exercised its discretion in denying the appellant's application for the appointment of an independent expert to examine the children. Family Court Act § 1038 (c), as recently amended, authorizes a respondent to move for an order permitting the allegedly abused child to be examined by his or her own expert. It has been observed that the new rights afforded respondents under the amended statute "arise from the inherent difficulties in child abuse cases", principal among which "are questions concerning the legitimacy of validation interviews" (*Matter of Angelica C.*, 149 Misc 2d 698, 700). In light of Ms. Layish's professional involvement with the children's mother and her role as Meredith's private therapist, the Family Court's denial of the appellant's

application for the appointment of an independent expert constituted an abuse of discretion.

Nor do I find sufficient corroboration in the Family Court's in camera interviews with the children. A review of the in camera transcripts fails to support the hearing court's suggestion that the two children "admitted" without reservation, that the appellant had committed acts of sexual abuse. Specifically, Erika never described in her own words any instances of abuse but instead consistently declined to discuss the allegedly improper acts perpetrated by her father. It was only when the Family Court posed a leading question, inquiring whether "Daddy ever put his fingers in [her] vagina", that Erika stated "yes," without further elaboration or narrative comment. Similarly, Meredith's interview elicited a series of inconsistent statements and denials, with affirmative responses forthcoming only after several leading questions were posed which incorporated certain of the allegations contained in the petitions. The inconsistent and equivocal statements elicited during the in camera interviews cannot be viewed as sufficient corroboration under the circumstances presented.

Additionally, and apart from the evidentiary deficiencies in the record, the Family Court's order is defective as a matter of law, not only because it fails to state the grounds for its findings with respect to each allegation of abuse contained in the petitions, but also because it failed to comply with Family Court Act § 1051 (e). That provision requires the Family Court to specify the particular form of child abuse established by the evidence and states that where a sex offense is determined to have been committed, the court must make a "further finding of the specific sex offense as defined by article [130] of the penal law" (see also, Family Ct Act § 1012 [e] [iii]). Family Court Act § 1051 (a) states, inter alia, that the court shall state the grounds for its finding. The Family Court utterly failed to comply with the foregoing statutory mandates even though the allegations contained in the petitions which it sustained accused the appellant of raping and sexually abusing the children within the meaning of Penal Law article 130. Indeed, the court's "findings" consist of a one sentence statement which conclusorily declares that the allegations of the petition were established by a preponderance of the evidence. At no point does the court's order separately identify and discuss precisely which of the allegations it was purporting to sustain or why. Appellate review of such a vacuous finding is virtually impossible (see, Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1051,

at 413-414). Moreover, the failure to make specific findings is particularly inexcusable in a case such as this one, where the petitions contain a variety of particularly serious allegations premised upon a number of distinct physical acts and occurrences.

Further, the court's order purports to sustain certain allegations contained in the petitions with respect to which no evidence at all was adduced at the fact finding hearing. Specifically, paragraph "b" of the January 1988 "amended" petition relating to Meredith alleges, *inter alia,* that the appellant "has made said child hold his penis while he urinates". Additionally, paragraph "d" of the same petition alleges, *inter alia,* that the appellant "has blown on said child's vagina". The Family Court, which sustained the petitions in their entirety, neither mentions the foregoing allegations nor identifies any evidence supportive of its conclusion that they were proven by a preponderance of the evidence. Indeed, there is not one iota of corroborative evidence in the record which could possibly support a finding that these acts of abuse had been committed by the appellant. The indiscriminate sustaining of allegations as to which no proof at all was adduced not only constitutes egregious error, it casts grave doubt upon the analytical process employed by the court in reviewing the evidence which was introduced at the fact-finding hearing. I am unwilling to believe that we have reached the point at which bare allegations, unaccompanied by even a shadow of evidentiary support, are sufficient to sustain such grievous accusations of sexual misconduct. In short, no special deference should be accorded a trier of fact whose review of the evidence has produced such a flawed and inconsistent series of findings, especially where the court has failed to articulate the analytical process by which its conclusions were reached *(see,* Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1051, at 413 ["in reviewing non-jury adjudications such as those made in Family Court, the appeals court is not bound by the trial court's finding of facts"]).

The veracity of the allegations must be tempered by a consideration of the context in which they arose. Neither party disputes that when the accusations of abuse were first made by the children's mother, she and the appellant were embroiled in a bitterly contested proceeding arising out of the appellant's marital infidelity. Dr. Raymond Di Giuseppe, a psychologist appearing on the appellant's behalf, testified in this respect that, "almost all major texts" counsel great

caution in evaluating allegations of sexual abuse arising within the context of a contested divorce proceeding. Moreover, there was evidence at bar that the intense bitterness between the appellant and his wife was such that on one occasion and in the presence of the children, the appellant's wife carved an obscenity into the family automobile with a car key and that on another occasion, while visiting the appellant's place of employment, she stated within the hearing of the appellant's coworkers, that she did not want her children to be "around whores". The personal animus of the appellant's wife is relevant since it is probative of her credibility.

Under these circumstances, and considering the absence of sufficient corrobative evidence, I conclude that the petitioner failed to sustain its burden of proving the allegations of sexual abuse by a preponderance of the credible evidence. Accordingly, the petitions should be dismissed.