■ In the Matter of JACLYN P. and Another. NASSAU COUNTY DEPARTMENT OF SOCIAL SERVICES, Appellant; ROBERT P., Respondent.

Robert P. is the father of Melissa P. and Jaclyn P. In or about July 1990 the petitioner Nassau County Department of Social Services commenced proceedings against the respondent, alleging that he had sexually abused and neglected both daughters. Relevant to Melissa, the petition alleged, *inter alia,* that Robert P. had committed acts of digital penetration, and that he had placed his penis in Melissa's mouth. After a fact-finding hearing, limited to the allegations of abuse pertaining to Melissa, the Family Court found that the petitioner had not met its burden of proof because the evidence was "absolutely even". The court dismissed both the petitions alleging abuse of Melissa P. and Jaclyn P. On this appeal, the petitioner and the Law Guardian challenge the court's findings which resulted in dismissal of the petition alleging abuse and neglect of Melissa. We find that the petitioner established that Melissa was an abused child, and we remit the matter to the Family Court, Nassau County, for a dispositional hearing.

The allegations of abuse of Melissa were based upon the child's out-of-court statements as well as upon the statements of her sister Jaclyn. It is well settled that such out-of-court statements, if adequately corroborated by evidence tending to establish their reliability, may support a finding of abuse *(see,* Family Ct Act § 1046 [a] [vi]; *Matter of Christina F.,* 74 NY2d 532; *Matter of Nassau County Dept. of Social Servs. v Steven K.,* 176 AD2d 326). Corroboration may be provided via the "validation testimony" of experts regarding their investigations of the underlying complaints of abuse *(Matter of Nassau County Dept. of Social Servs. v Steven K., supra; Matter of Linda K.,* 132 AD2d 149). Thus, sufficiently corroborated out-of-court statements may suffice to provide the requisite preponderance of the evidence by which the petitioner must establish its case *(see, Matter of Nicole V.,* 71 NY2d 112; *Matter of Latisha V.,* 175 AD2d 839).

At the fact-finding hearing, Melissa's mother testified that she first became aware of a problem in November 1989 when her niece and her daughter Jaclyn both reported, within approximately one week of one another, that Melissa had hurt each of them by placing her fingers inside their vaginas. When confronted, Melissa reported that she had been "playing the doctor game" taught to her by her father, the respondent. The mother testified that Melissa demonstrated this game by "vigorously" placing her fingers between the legs of a doll. Melissa's mother also testified that Melissa reported to

her that her father had taught her "the weenie game" in which her father placed his penis in Melissa's mouth. Furthermore, the witness stated that Melissa was exhibiting behavioral problems such as wetting herself and that she was suffering from nightmares. Alarmed, Melissa's mother contacted the police and the New York State Child Protective Services (hereinafter CPS).

CPS caseworker Debra Ross testified that she saw Melissa twice monthly for a total of 25 visits. On one such visit, Melissa reportedly described the "doctor game" to Ms. Ross, demonstrating it by trying to "poke" her fingers between the legs of a stuffed animal. Melissa reportedly told Ms. Ross that the respondent touched her in the same manner. When Ms. Ross tried to inquire further, Melissa ran from the room, carrying the stuffed animal. Melissa reportedly told Ms. Ross that she was afraid to be left alone with her father.

Pursuant to the recommendation of CPS personnel, Melissa was taken to see Yael Layish, a psychiatric social worker who serves on the "family crisis team" of North Shore University Hospital. Ms. Layish, who recounted her credentials in the field of child sex abuse and whose competence this court has previously acknowledged (see, Matter of Nassau County Dept. of Social Servs. v Steven K., 176 AD2d 326, 327, supra), testified that she first examined Melissa in December 1989. After introductory sessions to acquaint Melissa with anatomically-correct dolls, Melissa reported, and demonstrated to Ms. Layish, how, after undressing her, the respondent placed his fingers in her rectum and vagina, exposed his penis for Melissa to touch, and how he placed his penis in Melissa's mouth. Melissa told Ms. Layish that she wanted her father to stop playing the doctor game. Ms. Layish recounted other incidents during her therapy sessions with Melissa, and she detailed the five phases of child sex abuse syndrome. Upon consideration of all of the foregoing, Ms. Layish testified that, in her opinion, Melissa was acting in a manner consistent with that of a sexually abused child. She did not believe that Melissa had been "coached" into making these allegations.

Dr. Bruce Bogard, a pediatrician at Schneider's Children's Hospital of Long Island Jewish Medical Center, testified that he examined Melissa on February 9, 1990, for physical signs of sexual abuse. His rectal examination of Melissa disclosed nothing unusual, and her external genital structures were normal, showing no evidence of trauma. Her hymenal opening, however, measured seven millimeters. Dr. Bogard explained that generally, the hymenal opening in a normal

prepubertal child is less than five millimeters. Melissa's larger hymenal opening, Dr. Bogard testified, was consistent with sexual abuse but not necessarily indicative of abuse. Dr. Bogard explained, however, that sexual abuse may occur without resulting in physical findings and that digital penetration could occur without leaving a mark on the hymen. He stated that a finding of a hymenal opening greater than 10 millimeters would be more indicative of abuse, but that an opening of seven millimeters fell within a borderline area.

Dr. Howard Kirschen, a board-certified child psychiatrist, testified that he interviewed and evaluated Melissa, as well as Melissa's mother, father and younger sister Jaclyn. Dr. Kirschen testified that both parents exhibited personality disorders, and that Melissa was "an overall troubled child". Dr. Kirschen acknowledged that there was a possibility that Melissa had been "coached" into making false allegations against her father, and he acknowledged his reliance upon various reports of others involved in the investigation, including that of Ms. Layish indicating that Melissa had been abused. Nevertheless, it was Dr. Kirschen's opinion that Melissa showed signs consistent with being a victim of sexual abuse.

Testifying for the respondent, Dr. Mark Rich, a pediatric urologist, stated that he examined Melissa and found no physical evidence of sexual abuse. Dr. Rich stated that he found Melissa's genitalia to be normal, without any signs of physical abuse or trauma, and that the size of Melissa's hymen "was not particularly out of the norm of what a normal little girl that age would have * * * approximately one finger breadth". Dr. Rich conceded, however, that physical evidence of abuse is "often" not present in victims of abuse and that the absence of such evidence does not rule out a finding of sex abuse.

Tracy Grossman, a consultant psychologist at the Nassau County Department of Forensic Services interviewed Melissa in February 1990 in connection with her parents' custody dispute. Dr. Grossman, whose inquiry was primarily directed at ascertaining Melissa's feelings about visitation with each of her parents, stated that Melissa showed no evidence of sexual abuse during the one session they were together; however, neither could Dr. Grossman rule out that such abuse had occurred.

Florence P., Melissa's paternal grandmother, testified that she supervised Melissa's visitation with her father. The witness recounted that at the end of the children's March 24, 1991, visit with their father, Melissa and Jaclyn both cried

hysterically and stated that they hated their mother and refused to leave their father. On the ensuing weekends following that visit, however, the mother refused to permit the children to visit the respondent. The witness stated that Melissa never complained to her of any problems with the respondent.

Dr. Monty Weinstein, a psychologist and family therapist, testified that he observed Melissa and Jaclyn interact with their father on two occasions. He described a "warm, bonding nurturing type of relationship" between father and children. Based upon his observations of the interactions between the children and their father, Dr. Weinstein opined that the allegations of abuse were unfounded, as abused children would not react to the abuser in the warm and loving manner Jaclyn and Melissa exhibited toward the respondent. Dr. Weinstein also criticized Yael Layish's methodology regarding her use of the anatomically-correct dolls, implying that Ms. Layish was predisposed to findings of abuse in situations where other validators would not find abuse. Dr. Weinstein further opined that the children's alleged refusals to visit with their father after the March 24, 1991, visit were the result of their mother's alienation of them against their father. However, Dr. Weinstein's observations occurred over a period of "a couple of hours", during which he never spoke to the children, nor did he at any time speak to their mother. Rather, Dr. Weinstein's conclusions rested almost exclusively upon his observations of the children interacting with the respondent, the very party paying his expert fee, who was aware that Dr. Weinstein was observing him at the time of his interactions with the children. Dr. Weinstein made no attempts to question the children as to whether or not they had been abused.

The respondent Robert P. denied that he sexually abused his children. Rather, he stated that the only times he ever touched his daughters' genital areas was in connection with cleaning them after changing their diapers or in bathing them. Furthermore, he asserted that the allegations of sexual abuse were fabricated by his wife, who was engaged in an extramarital affair and who was trying to influence future custody determinations.

Dr. Naomi Adler, a psychologist, testified as the court's expert witness. Dr. Adler saw the respondent over several sessions in an attempt to evaluate his psychological condition. She noted that the respondent refused to submit to two of the tests that would have been administered as part of her evaluation, and she found him to be defensive and suffering from a

nonspecified personality disorder. The respondent's refusal to cooperate fully prevented Dr. Adler from determining whether he was aroused by deviant sexual stimuli, and Dr. Adler offered no opinion as to whether or not the respondent had in fact abused his children.

In addition to the reports of the various expert witnesses received in evidence, the court conducted an in camera interview of Melissa. Melissa, however, refused to cooperate during this proceeding, and thus revealed nothing about the allegations of abuse.

At the conclusion of the fact-finding hearing, the court dismissed the petition, finding that the evidence was "even", and thus the petitioner DSS had failed to prove its case by a preponderance of the evidence. Beyond this succinct conclusory statement, the court did not expressly state the grounds for the dismissal as required by Family Court Act § 1051 (c) *(see, Matter of Erika M.,* 97 AD2d 847). Even assuming that the court had adequately detailed its findings of fact, however, we are not bound by those findings *(see,* Besharov, Practice Commentary, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1051, at 413). Although the determination of the trier of fact is entitled to appropriate deference, in this case we find that the weight of the evidence is so strongly in favor of a finding of sexual abuse that the petition should be sustained *(cf., Matter of Linda E.,* 143 AD2d 904).

To begin with, Melissa's mother recounted the allegations revealed to her by Melissa. Although these allegations arose within the context of a custody dispute, they were corroborated by the validation testimony of Ms. Layish, the independent court-appointed psychiatric social worker *(see, Matter of Nassau County Dept. of Social Servs. v Steven K., supra).* Ms. Layish initially examined Melissa over three evaluation sessions in December 1989, and thereafter continued as her therapist for at least 40 sessions from January 1990 through the time of trial in March 1991. Ms. Layish's testimony is thus highly reliable, since she has had more than ample opportunity to observe and evaluate Melissa's repeated reports of abuse. Indeed, that Melissa told Ms. Layish of her father's abusive actions on several occasions only further serves to underscore Melissa's veracity, since it is unlikely that she could maintain such a consistent series of fabrications. Moreover, Dr. Bogard found that Melissa's hymenal opening measurement of seven millimeters, while not necessarily indicative of sexual abuse, was consistent with such a finding. We would note, however, that a finding of sexual abuse is not

dependent upon corroborating physical findings *(see, Matter of Latisha V., supra; Matter of Linda K., supra).* Indeed, Dr. Bogard explained that digital penetration could occur without physical injury to the hymen and the petitioner's own expert, Dr. Rich, conceded that the absence of physical trauma does not rule out a finding of abuse. Dr. Kirschen, too, believed that Melissa was a victim of sexual abuse.

Other than the respondent's denials, the only evidence tending to support a finding that Melissa had not been abused was provided by the respondent's paid expert, Dr. Weinstein. However, Dr. Weinstein's opinion that the respondent had not abused Melissa was based primarily upon his two observation sessions during which all parties, including the children, were aware of his presence. Moreover, although Dr. Weinstein was critical of Ms. Layish's methodology, his own investigatory techniques were arguably flawed since he never spoke to the children, and it was apparent from his testimony that Dr. Weinstein held Ms. Layish in low professional esteem. In short, we find that Dr. Weinstein's limited access to the children and the limited scope of his analysis renders his opinion unpersuasive. The respondent's other expert witnesses similarly do not persuade us that Melissa had not been abused by her father.

On balance, our review of the entire record leads us to conclude that the allegations of abuse were established by a preponderance of the credible evidence (Family Ct Act § 1046 [b]; *Matter of Nicole V., supra).* Accordingly, we find that allegations 5a and 5b of the petition alleging that the respondent abused Melissa, are sustained, and we remit this matter to the Family Court, Nassau County, for a dispositional hearing. Kunzeman, J. P., Eiber, Miller and Ritter, JJ., concur.